Filed 6/9/21  In re I.Z.B. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re I.Z.B., A Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>I.B.,<br><br>      Defendant and Appellant. | A161652<br><br>(Contra Costa County<br> Super. Ct. No. J19-00493) |

In this dependency appeal, I.B. (mother) challenges the juvenile court's order terminating her parental rights with respect to her daughter, I.Z.B., at a permanency planning hearing held pursuant to section 366.26 of the Welfare and Institutions Code.[1]  Mother's sole contention on appeal is that the juvenile court erred by failing to apply the beneficial relationship exception to adoption, which would have blocked termination of her parental rights.  Although we sympathize with mother's difficult upbringing and

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

applaud her recent progress in stabilizing her life both for herself and for her other child, we affirm.

## I. BACKGROUND

A detailed history of this juvenile dependency proceeding can be found in our prior opinion in the matter. (*I.B. v. Superior Court* (Oct. 29, 2020, A160786) (*I.B.*) [nonpub. opn.].) We summarize the case through the 12-month review at which mother's reunification services were terminated by reference to that opinion: The Contra Costa County Children and Family Services Bureau (Bureau) detained I.Z.B. from mother and T.E. (father) shortly after her birth, based on pervasive domestic violence between the couple.[2] Mother—who at 17 years of age was herself a dependent minor in Contra Costa County— has a lengthy history of being a Commercially Sexually Exploited Child (CSEC), beginning with sexual exploitation by her mother from the age of 10. Prior to I.Z.B.'s birth, mother was refusing to enter any approved placements because she did not want to leave father, and there were concerns that she had smoked marijuana and was being trafficked while pregnant. Given her age, a guardian ad litem was appointed for mother.

At the jurisdictional hearing in June 2019, the juvenile court sustained the allegations in an amended petition and declared I.Z.B. to be a person described by subdivision (b) of section 300. At the July 2019 dispositional hearing, I.Z.B. was declared a juvenile court dependent, formally removed from parental custody, and placed in foster care. Mother was ordered to participate in a reunification plan, including domestic violence counseling, general counseling, parenting classes, and substance abuse testing.

---

[2] Father has not appealed from the termination of his parental rights with respect to I.Z.B. and thus we focus this discussion on relevant facts related to mother.

Mother's engagement in reunification services was hampered by repeated incidents of domestic violence and chaos in her life. Shortly after the dispositional hearing, father was arrested after he went to the group home where mother was residing, threatened mother and I.Z.B., and gave mother a black eye. Five months later, mother was beaten up, reportedly by several of father's relatives. From December 20, 2019, to January 3, 2020, mother posted 32 prostitution ads on three different prostitution websites. She would not tell the social worker where she was living and made little progress on her case plan, other than completing a parenting class.

At the six-month review in March 2020, father's reunification services were terminated, but the parties stipulated to extend services for mother to the 12-month review. In agreeing to extend mother's services, Bureau counsel stated: "[W]e've had a lot of discussions, and the bottom line is the department is very understanding of the fact that [mother] came through our system as a dependent. She has been a victim of different forms of abuse in her youth. She is considered to be a CSEC person/victim. [¶] And she—things are somewhat spiraling for her out of control. And the department wants to do everything in its power to assist her to try to get things back on track before it's too late for her." Although the 12-month date was only three months out, the Bureau "wanted to help mother re-engage in services and get her some mental health assistance."

In advance of the 12-month hearing, the Bureau filed reports indicating that mother had been complying with her services. In addition, mother appeared to have ceased her involvement with father. However, describing a number of ongoing risky encounters with a roommate, a co-worker, and other individuals, the social worker opined that mother had not made significant

3

enough behavior changes and did not appear to understand the risks and safety concerns for herself and her young infant.

At the contested 12-month review hearing on August 6, 2020, the court commended mother for her recent participation in services. However, it found that there was "a great deal of instability and chaos in her life," expressing particular concern about mother's continued risky and unwise choices. It concluded that "although she's taken the classes and has been able to articulate a safety plan, she is not, in fact, able to keep herself safe and, by extension, her daughter safe if her daughter were with her." The court found by clear and convincing evidence that there was no substantial probability that I.Z.B. would be returned to mother if services were extended to 18-months. It therefore terminated mother's reunification services and set the matter for a permanency planning hearing pursuant to section 366.26 so that a permanent out-of-home plan could be established for I.Z.B.[3] At that same hearing, the court also granted the foster parents' request for de facto parent status.

In a report filed in advance of the permanency planning hearing, the Bureau recommended that parental rights be terminated and I.Z.B. be placed in a permanent plan of adoption. Throughout these proceedings, mother attended supervised visitation with I.Z.B. once per week for one hour. Specifically, mother attended 34 out of 39 visits prior to the COVID-19 pandemic, 23 of 26 video visits, and all 19 of the scheduled in-person visits that recommenced in June 2020. Although mother was, at times, reported to be distracted and multi-tasking during visitation, generally she was

---

[3] On October 29, 2020, we denied mother's writ petition contesting the juvenile court's setting order, concluding that reasonable services had been provided to her and that the juvenile court did not err by declining to continue reunification services to the 18-month date. (*I.B.*, *supra*, A160786.)

affectionate, appropriate, and attentive. However, the minor, now a one-year old, often cried during visits and was difficult to sooth unless the caregivers remained present. The Bureau opined that the parent-child relationship that existed between mother and I.Z.B. did not outweigh the benefits of permanency for the minor.

The permanency planning hearing on December 3, 2020 proceeded solely by argument. Minor's counsel supported the Bureau's recommendation that parental rights be terminated, noting that I.Z.B. had been with the de facto parents for an extended period, sought them out for comfort, and was thriving in their care. Mother's attorney, in contrast, argued that the beneficial relationship exception to adoption should apply because mother had frequent and loving contact with the minor, and I.Z.B. would benefit from maintaining her positive emotional attachment to mother. Counsel stressed that I.Z.B. knew her client as mother. Counsel also reported that mother was working two jobs, living independently, and managing her current pregnancy well.

The juvenile court found I.Z.B. both generally adoptable and specifically adoptable by the de facto parents. It terminated parental rights and ordered adoption as the permanent plan for the minor. In rejecting the existence of the beneficial relationship exception to adoption on this record, the court noted mother's past history of severe domestic violence, substance abuse, and dangerous behaviors. It emphasized that I.Z.B. had been in the home of the de facto parents for all but nine days of her young life. During that time, she had thrived, forming "a very close bond" with her caregivers. The court found that I.Z.B. sought out her caregivers "for assurance, affection, security, and love." While it found that mother loved I.Z.B., and had visited her consistently and appropriately, the juvenile court noted that

5

mother had difficulty soothing the minor without the presence of the caregivers. Stressing that its decision was not a criticism of mother, the court concluded that the benefit I.Z.B. derived from her relationship with mother was outweighed by the permanence an adoptive home could provide for the young minor. This appeal followed.

## II. DISCUSSION

At a permanency planning hearing held in accordance with section 366.26, the juvenile court is charged with determining the most appropriate permanent plan of out-of-home care for a dependent child that has been unable to reunify. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50, disapproved on another ground in *In re Caden C.* (May 27, 2021, S255839) (*Caden C.*) at fn. 5.) When reunification efforts with a parent fail, as they did in this case, the focus shifts from family preservation "to the needs of the child for permanency and stability." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1163.) Thus, permanency planning hearings, as the name implies, are "designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52–53.) As the most permanent of the available options, adoption is the plan preferred by the Legislature. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) Indeed, when a court finds that a child is likely to be adopted if parental rights are terminated, it *must* select adoption as the permanent plan unless it finds a reason for determining that "termination would be detrimental to the child" due to one or more of the statutory circumstances delineated in section 366.26. (§ 366.26, subd. (c)(1)(B); *In re A.A.* (2008) 167 Cal.App.4th 1292, 1320.)

The statutory exception at issue in these proceedings—the beneficial relationship exception—applies where termination of parental rights would be detrimental to the child because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) As the Supreme Court recently explained in *Caden* C., "[f]rom the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child. (*Id.* at p. 12, italics omitted.) Our high court also reaffirmed "a crucial aspect of the trial court's responsibility in these cases: in assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Ibid.*, citing with approval the seminal case of *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

The first element of the beneficial relationship determination asks the "straightforward" question "whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, at pp. 12-13.) Courts should concentrate on whether "[v]isits and contact 'continue[] or develop[] a significant, positive, emotional attachment from child to parent'" as the focus throughout the beneficial relationship analysis "is on the best interests of the child." (*Id.* at p. 13; see also *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) As for the second element, the parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the

child's particular needs.' " (*Caden C.*, at p. 13, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) The juvenile court's focus should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Ibid.*)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, at p. 14.) Under this element, the court is again guided by the child's best interest, but in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. (*Ibid.*)" (*Caden C.*, at p. 15.)

We review the first two elements, consistent visitation and the existence of a beneficial relationship, for substantial evidence. (*Caden C.*, *supra*, at p. 25.) "The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Ibid.*) Consideration of the third element also involves numerous explicit or implicit findings—including specific features of the child's relationship with the parent, the harm associated with losing those features, whether an adoptive placement would offset or counterbalance those harms, and specific benefits

of adoption based on characteristics of the child —that are reviewable for substantial evidence.  (*Id.* at p. 26.)  However, the ultimate decision, "weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home[,] . . . is discretionary and properly reviewed for abuse of discretion."  (*Id.* at pp. 26-27.)

In the present case, there is no dispute that mother maintained consistent visitation with I.Z.B.  Moreover, that contact likely developed some level of positive, emotional attachment from child to parent.  Further, under the second element, the continuation of the mother-child relationship would likely provide some benefit to I.Z.B.  However, given her young age and the fact that she was removed from mother's custody days after her birth, it is difficult to describe that benefit to I.Z.B. as substantial at this juncture.  The juvenile court here focused on the third element—whether termination of the relationship would be detrimental because "the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home."  (*Caden C.*, *supra*, at p. 12.)  The court concluded severance of the parent-child relationship would not be detrimental because any benefit I.Z.B. derived from her relationship with mother was outweighed by the permanence an adoptive home could provide.

The court noted, "[a]lthough [mother] loves her child and has visited regularly, her connection with the child is not as deep and strong as the connection with the caregivers.  I think it was best demonstrated by the description in the report that when [I.Z.B.] was upset and needed consoling, [mother] was unable to console her but the caregivers were able to console her.  [¶]  And that's not a criticism of [mother].  It's a reflection of the fact that the caregivers have been with this child every minute of its life, since nine days old, and that is a reflection of their bond and connection with the

9

child, and that bond is stronger and more beneficial to the child than the parent-child relationship between [mother] and [I.Z.B.]." As the court acknowledged, this was "decidedly not a contest of who would be the better custodial caregiver." (*Id*. at p. 16.) It was simply an acknowledgement that, given I.Z.B.'s young age and situation, a permanent adoptive home was clearly in the minor's best interests. We see no abuse of discretion.

### III. DISPOSITION

The judgment is affirmed.

10

_____

SANCHEZ, J.

We concur.

_____

HUMES, P.J.

_____

MARGULIES, J.

(A161652)

11